**JOSHUA MADRID** and **SARAH PANTER**, Individually and Next Friend of Their Minor Child**, P.M.**
    Plaintiffs

vs.

**UNITED STATES OF AMERICA**,
        Defendant

**NO. 3:24-CV-01060**

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Joshua Madrid and Sarah Panter, Individually and as Next Friend of their Minor Child, P.M., bring their First Amended Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States and would show the following:

### PARTIES

1.1.    This is a medical malpractice case that arises out of bodily injuries caused by agents and employees of the United States at the Blanchfield Army Community Hospital, Fort Campbell.

1.2.    Plaintiffs Joshua Madrid and Sarah Panter and their Minor Child, P.M. reside in Clarksville, Tennessee, which is within the jurisdiction of this Court.

1.3.     Sarah Planter is a civilian and is married to Joshua Madrid. P.M. is their daughter.

1.4.     Defendant is the United States of America, its officers, agents, employees, and representatives.

## JURISDICTION, SERVICE & VENUE

2.1.     This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

2.2.     The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the acting United States Attorney Henry C. Leventis, United States Attorney for the Middle District of Tennessee by certified mail, return receipt requested at his office:

> The United States Attorney's Office
> ATTN: Civil Process Clerk
> 719 Church St., Suite 3300
> Nashville, TN 37203

2.3.     Service is also affected by serving a copy of the Summons and Complaint on Merrick B. Garland, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

2.4. Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant and the acts and omissions complained of in this lawsuit occurred in this judicial district.

## AGENCY

3.1. This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts and/or omissions of employees and/or agents of the United States of America working for the Department of the Army, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual.

3.2. The United States Department of the Army is an agency of the United States of America.

3.3. The United States of America, through its agency, the Department of the Army, at all times material to this lawsuit, owned, operated, and controlled Blanchfield Army Community Hospital, and staffed it with its agents, servants, or employees.

3.4. At all times material to this lawsuit, including in 2021, providers at the Blanchfield Army Community Hospital were acting within

the course and scope of their employment when providing treatment to Sarah Panter and her minor child P.M.

3.5.    In 2021, the Blanchfield Army Community Hospital provided care and treatment to Sarah Panter and her minor child P.M. Both Sarah Panter and P.M. were patients of the Blanchfield Army Community Hospital and its providers had a doctor-patient relationship with Sarah Panter and P.M.

3.6.    The following individuals were employees of the United States of America or its agency, acting within the course and scope of their employment when they provided treatment to Sarah Panter and her child P.M.: Tiffany D. Williams, CNM; Jeffrey S. Callaway, RN, Lisa M. Pierson, M.D., Amelia Herink, SNM, and Shirley A. Fuell-Harris, CNM.

## JURISDICTIONAL PREREQUISITES

4.1.    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the Department of the Army on August 30, 2023.

4.2.    The claim of Joshua Madrid and Sarah Panter, as Next Friend of their Minor Child, P.M., set forth a "sum certain" of $40,000,000.

4.3.    The individual claims of Joshua Madrid and Sarah Panter each set forth a "sum certain" of $40,000,000.

4.4.    No exception to the Federal Tort Claims Act, 28 U.S.C. § 2680, bars this lawsuit.

4.5.    More than six months has passed since the presentation of these claims and the United States Army has failed to resolve the claims. All claims are deemed denied.

4.6.    Accordingly, Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1.    This is a Federal Tort Claims Action for money damages based on substandard medical care provided by agents and employees of the United States at Blanchfield Army Community Hospital at Fort Campbell, TN to Sarah Panter and her infant daughter, P.M. through labor and delivery on September 11, 2021 resulting in serious, personal injuries to P.M.

5.2.    On or about March 10, 2021, Sarah Panter initiated obstetrical care with Blanchfield Army Community Hospital. At the time, she was 24 years old and this was her first pregnancy. On April 14, 2021, an ultrasound revealed a healthy baby with no abnormalities in the breech position.

5.3.    On April 15, 2021, Sarah presented for her 18-week routine appointment. She reported dysuria and a UA and culture were pending. She reported positive fetal movement, a reassuring sign of fetal well-being. The fundal height was 18 weeks, which supports normal fetal growth and development for 18 weeks of pregnancy. An ultrasound with an anatomy scan was ordered.

5.4.    On April 20, 2021, at 18 weeks, Sarah was diagnosed with Group B strep and treated with Amoxicillin, 500 mg for 10 days. On May 1,

2021, she presented at 21 weeks with the loss of clear fluid since that morning. She had no contractions. She was evaluated for possible premature rupture of membranes, but Government providers were able to rule that out, having found no evidence that her membranes ruptured.

5.5.     On June 2, 2021, Sarah presented for a routine follow-up appointment. The fetus was active and the fetal heart rate (FHR) was normal at 150 bpm. On June 22, 2021, she presented for a routine 28-week follow-up visit. The FHR was normal at 150 bpm. At this time, the pregnancy risk level was noted as "uncomplicated."

5.6.     On June 26, 2021, Sarah presented at 29 weeks for decreased fetal movement, but stated that she had felt the baby move. The electronic fetal monitor (EFM) was applied and the fetal heart rate was normal in the 140s. The EFM demonstrated positive fetal movement and a reactive, reassuring nonstress test for gestational age, with fetal heart accelerations 10x10 and no decelerations seen. Sarah was released without limitations and told to follow up in the clinic.

5.7.     On July 19, 2021, Sarah presented at 32 weeks, 2 days. The fundal height was 36 cm (bigger than expected for a 32 week pregnancy). The fetal heart rate was normal at 138 bpm. Providers noted that the baby could be felt moving in the uterus. It was reported that Sarah had excessive weight gain and the baby was large for gestational age so a growth scan was ordered.

5.8.     On July 29, 2021, Sarah called to schedule the growth scan, but the soonest appointment she could get was August 23, 2021. She asked if that was okay and was told by the Government provider that if that was all that

was available, to "keep it, and let your provider know at the next appointment."

5.9. On August 16, 2021, Sarah appeared for a routine appointment. It was determined that she was large for gestational age, measuring 40 cm at 36 weeks of pregnancy. However, the providers noted that her pregnancy risk level remained "uncomplicated." She was negative for fluid leak, vaginal bleeding, or contractions. On this visit, the provider noted that the baby could be felt moving in the uterus, a reassuring sign. She was again released without limitations and told to follow up in two weeks.

5.10. On August 21, 2021, Sarah presented at 36 weeks with right sided abdominal pain, 5/10, following 16 Braxton Hicks contractions. She denied vaginal bleeding or loss of fluid. The EFM was applied, and the FHR was normal at 120 bpm. The record noted that the baby could be felt moving in the uterus and the fetal movement was noted as "good" fetal movement, a reassuring sign. Her cervix measured 1/40/-3 softening. She had a reactive, reassuring non-stress test. Ultimately, the providers concluded that she simply had false labor and was released without limitations and told to follow up in the clinic.

5.11. On August 30, 2021, Sarah presented at 38 weeks, 2 days. She was feeling fine and denied problems. The baby was active with no decreased fetal movements. At this visit, the weight gain was adequate. She was seen by a maternal fetal medicine (MFM) specialist for a fundal height larger than expected. Sarah told the providers that the MFM had examined her and the baby and was told "everything is okay." At this visit, her provider noted "Fetus is active with no decreased [fetal movement.]" Their assessment on this visit concluded that fundal height was within normal limits, doppler

tones were positive, meaning fetal heart rate tones were detected normally via Doppler, and blood pressure was within normal limits.

5.12.    On September 1, 2021, Sarah had a telephone consult. She was 39 weeks and her MFM had recommended potentially inducing at 39 weeks, but due to the providers' full schedule, induction of labor was discussed for 40.1 weeks. She was advised to come in to Labor and Delivery as needed and she was scheduled for induction for September 12, 2021.

5.13.    On September 7, 2021, Sarah presented at 39 weeks, 3 days. She reported feeling fine and denied problems other than routine pregnancy discomforts. She denied loss of fluid, vaginal bleeding, contractions or recent illness. Her weight gain and fundal growth was adequate and within normal limits. She reported an actively moving fetus with no decreased fetal movement. Her fundal height now measured 41 cm, the FHR was reassuring at 130 bpm, and the baby had a reactive, reassuring non-stress test.

5.14.    On September 9, 2021, she presented at 39 weeks, 5 days for a blood pressure check. Her BP was 125/90, heart rate was 97, and the FHT was normal at 137 bpm. Providers noted normal blood pressure and no signs of pre-eclampsia. They released her home without limitations.

5.15.    On September 10, 2021, Sarah presented at 39 weeks, 6 days following spontaneous rupture of membranes at 1400. No fluid was noted on the chux and her perineum was dry. The EFM was applied to mother and baby, and the adjusted FHR was in the 140s, in a normal range with a reactive and reassuring nonstress test, with moderate variability and accelerations present. The reactive nonstress test, moderate variability, and

Case 3:24-cv-01060    Document 12    Filed 09/13/24    Page 8 of 23 PageID #: 86

accelerations demonstrate fetal well-being and a baby that has adequate oxygen perfusion and is not in metabolic acidosis.

5.16.     There is a three-tier fetal heart rate monitor interpretation system used by obstetricians and nurse midwives. A Category I strip, considered normal, has a baseline fetal heart rate between 110-160 bpm, moderate variability, fetal heart rate accelerations can be present or absent, and there are no late, variable or prolonged decelerations. A Category I strip is considered strongly predictive of normal fetal acid-base status at the time of observation.

5.17.     Fetal heart rate accelerations reliably predict the absence of fetal metabolic acidemia at the time they are observed.

5.18.     A Category III strip is abnormal. It has absent variability with any of the following: recurrent late decelerations, recurrent variable decelerations, or bradycardia, or a sinusoidal pattern. A Category III strip is predictive of abnormal fetal acid-base status at the time of observation.

5.19.     A Category II strip is anything other than Category I or III, and it requires evaluation, surveillance, and reevaluation, considering the entire associated clinical circumstances. Based on the monitoring of the mother and baby, providers should offer the appropriate intervention. Interventions vary from repositioning the patient to an emergent c-section.

5.20.     At 2121, Sarah had her first assessment. Sarah and the baby were doing well. She denied pain and noted contractions had spaced out. Fetal monitoring showed a reassuring fetal heart rate at 130, moderate variability and accelerations without decelerations. At this time, the FMS

showed a Category I pattern, indicating a normal fetal acid-base status and heathy baby.

5.21.    Her sterile vaginal exam (SVE) revealed 3 centimeters dilated, 90% effaced, and -3 station for the fetal head station. Nurse Midwife Tiffany Williams, CNM, ordered oxytocin/Pitocin augmentation.

5.22.    At 2130, Pitocin was ordered for labor augmentation due to slow progress. The vaginal exam showed a Bishop score of 8, cephalic presentation by exam, and adequate pelvimetry. The estimated fetal weight was 3900g. At the time, Nurse Jeffrey Callaway certified that before starting Pitocin, the baby had been monitored for at least 30 minutes, had at least two accelerations (15 bpm × 15 seconds) or a biophysical profile (BPP) score of 8/10 or moderate variability. He certified there were no late decelerations within the last 30 minutes. All of these certifications demonstrated, at this time, a healthy, well-oxygenated fetus not in any distress. For several hours, the strip continued to be Category I, indicating a normal fetal acid-base status and heathy baby.

5.23.    At 0536, the second assessment was conducted. Contractions were every 2–4 minutes, irregular, and Pitocin was at 10 mu/min. The IUPC was not working properly and could not be replaced due to fetal station. The sterile vaginal exam showed 8 cm dilated, 100% effaced, and -2 station, which indicates the cervix was dilated to 8 cm and fully thinned out, and the fetal head had descended to -2 station. The fetal heart baseline was in the 140's, still in the normal range, with moderate variability, positive for accelerations and negative for decelerations. All of these signs were positive, reassuring signs of fetal well-being and a well-oxygenated baby not in any fetal distress.

5.24.    But just after this assessment, at 0542, the fetal heart tracing transitioned away from a Category I pattern of moderate variability to a Category II pattern characterized by minimal and absent variability. At 0623, an undefined deceleration appeared on the fetal heart monitor.

5.25.    Once a category II FHR pattern is identified, according to Dr. Steven Clark's algorithm published in 2013 in the American Journal of Obstetrics and Gynecology, the standard of care requires the FHR to be evaluated and the algorithm for management of category II fetal heart rate tracings to be applied every 30 minutes. But Sarah did not have another assessment in 30 minutes. No one evaluated Sarah or the baby again for another two and a half hours.

5.26.    When a fetal heart monitor demonstrates a category II strip with minimal to absent variability, the standard of care requires that a provider follow the algorithm for management of category II fetal heart rate tracings:



5.27. For category II FHR patterns in which the algorithm suggests delivery is indicated, delivery should be initiated within 30 minutes from the decision for cesarean (colloquially referred to in the obstetric community as "decision to incision") if operative vaginal delivery is not available or imminent.

5.28. If providers applied the algorithm to Sarah's fetal heart monitor tracing at 0700, the providers should have answered (No) when looking for moderate variability, then answered (No) to whether there were "Significant decelerations with $\geq$ 50% of contractions for 30 minutes." At this point, the algorithm allows for only one hour of observation, but over an hour of minimal to absent variability had already transpired, demonstrating a (Yes) to there being a "persistent pattern". At 0700, the providers should have moved to "cesarean delivery" within half an hour by 0730 because the baby was not at a station for a safe operative vaginal delivery. Had providers applied the algorithm correctly at 0700, Sarah should have been offered a cesarean section by 0730 and more likely than not, P.M. would have been delivered without incident or injury. But providers did not assess Sarah at 0700, did not follow the algorithm, and P.M. was not safely delivered by cesarean section at 0730.

5.29. There was a short period of moderate variability between 0710 and 0720, but the overall variability remained absent to minimal. At 0751, the fetal heart rate showed a prolonged, late deceleration, hovering just above 90 before returning to a baseline of 145 but with minimal to absent variability.

5.30. After two full hours of minimal to absent variability, and less than 10 minutes after a prolonged late deceleration, at 0800 Sarah had her third assessment. This evaluation was done by a student nurse midwife, Amelia Herink. She documented that Sarah was happy and comfortable with her epidural. Ms. Herink did not document that the FMS showed two hours of minimal to absent variability or the prolonged late deceleration. But in addition to two hours of minimal to absent variability, the fetal heart monitor showed fetal heart rate decelerations when Sarah was on her back, that returned to baseline with repositioning. It also showed ongoing minimal to absent variability even with fetal scalp stimulation, representing a category II strip. Contractions were frequent—every minute.

5.31. A reasonable health care provider would have stopped Pitocin with contractions every minute, decelerations, and minimal variability for over two hours. Instead of stopping the drug, Pitocin was decreased from 12 to 6 mu. The sterile vaginal exam revealed AL/100/-1 showing the cervix was fully thinned out and effaced, and the baby's head was still relatively high at -1 station.

5.32. At the 0800 assessment, providers should have applied the algorithm to Sarah's fetal heart monitor tracing, looking for moderate variability (No), then whether there were "Significant decelerations with $\geq$ 50% of contractions for 30 minutes" (No). At this point, because two hours of a "persistent pattern," of minimal to absent variability had already transpired, providers should have moved to cesarean. At this point, vaginal delivery was not possible. Had providers performed a cesarean section by 0830, more likely than not, P.M. would have been delivered without incident

or injury. But the algorithm was not followed at 0800, and P.M. was not safely delivered by cesarean section at 0830.

5.33. With a Category II strip, Sarah and the baby should have been assessed at least every 30 minutes. But Sarah was not assessed again for over an hour, and the minimal to absent variability continued for the third consecutive hour.

5.34. At 0910, Sarah had a fourth assessment, also done by student Nurse Midwife Amelia Herink. At this time, she was still resting comfortably and could feel her abdomen and left leg but could not feel contractions. Dr. Pierson came in to assess Sarah and attempted to rotate the baby's head to the OA position. The fetal heart rate continued to show minimal to absent variability with no decelerations, but providers could not elicit an acceleration with fetal scalp stimulation. FHR accelerations reliably predict the absence of fetal metabolic acidemia at the time they are observed.

5.35. After three hours of minimal to absent variability, the inability to elicit a fetal heart acceleration with fetal scalp stimulation is a concerning sign regarding fetal well-being and oxygenation. This means that providers could not exclude that the baby was becoming hypoxemic. The fetal scalp electrode was off and the external monitor was applied. Contractions occurred every 1 to 2.5 minutes and the vaginal exam showed complete dilation, complete effacement and +1 station. In addition to a pattern of consistent minimal to absent variability, there was also a consistent pattern of excessive uterine activity, but there was no documentation of this from any provider or any plans to mitigate this by any provider.

5.36.    Had providers applied the algorithm at 0910, the result would have been identical: moderate variability (No), "Significant decelerations with $\geq$ 50% of contractions for 30 minutes" (No); it had already been 3 straight hours of minimal to absent variability establishing an unsafe "Persistent pattern" (Yes). Providers should have moved to cesarean delivery no later than 930. But the algorithm was not followed at 0910, and P.M. was not delivered by cesarean section at 930.

5.37.    Despite the fetal monitor strip showing persistent minimal to absent variability for three hours and excessive uterine activity, and the inability of providers to elicit accelerations with fetal scalp stimulation, Sarah was not evaluated again for well over an hour, until 1028. Between 0900 and 1000, the fetal heart rate continued to demonstrate minimal to absent variability, with occasional decelerations. At 1028, Sarah had her fifth assessment. There was concern that the fetus was still OP; an ear was felt but the fetus was rotated vertex 180 degrees. This represents fetal malpositioning. About that time, the FHR demonstrated a prolonged deceleration and bradycardia, with the FHR below 90, at which time pediatrics was called. Instead of a cesarean section, Sarah had a vaginal delivery after the infant's "tight shoulders" were resolved with "superior pushing and gentle downward traction." The baby was delivered vaginally by a certified nurse midwife with no obstetrician present at 1036, and the cord separated in the middle and remained attached to the umbilical cord and placenta. The nurse midwife pinched the cord and applied a clamp. The infant was taken to a warmer.

5.38.    A nurse practitioner—not a physician—attended the delivery due to "decelerations before delivery." The baby was delivered limp with no

respiratory effort. Meconium was found in the delivery. The baby was warmed, dried and stimulated without response. Positive Pressure Ventilation (PPV) was started, with no respiration effort by the baby. An oxygen saturation probe was placed on the right wrist, and O2 saturation was 95-100% with 50% oxygen with PPV. The baby began to have intermittent respiratory effort which was not sustained until 3–4 minutes of life. Respiratory effort slowly improved until PPV was stopped, and the baby was grunting with shallow breaths. The general appearance was "ill appearing, poor tone, pale" with the head showing significant molding and boggy ecchymosis. APGARs were 2, 4, and 7. It was noted that the baby was at increased risk due to rupture of membranes >20 hours and cephalohematoma or significant bruising.

5.39.    Cord blood gases are measurements taken directly from the blood within the umbilical cord right after delivery. The cord is clamped at delivery and, as a result, provide an objective measure of the newborn's condition at birth and should be obtained in situations where there are any concerns about fetal well-being during labor and delivery. That's because certain cord blood gases will result in providers deciding to follow a cooling protocol to prevent or minimize the effects of hypoxic ischemic encephalopathy. Though the standard of care requires that cord blood gases be drawn when there is a delivery involving shoulder dystocia, a delivery with meconium stained fluid, in a baby with an Apgar score <5 at 5 minutes, in a delivery where the baby is born in poor condition, and in a delivery where the baby requires resuscitation—all of which applied to P.M.—no cord blood gases were drawn. Because no cord blood gases were drawn, no cooling protocol was offered to P.M.

5.40. After providers noted an increase in the size of the head at 1235, providers notified the parents that it was necessary to transfer the baby to a facility with a higher level of care—Vanderbilt. The transport team arrived by 1710 and at 6+ hours of life, at 1735, the baby was transferred to Vanderbilt.

5.41. However, after the transfer to Vanderbilt, Blanchfield would not release Ms. Panter from the hospital until she and her husband attended a "how to take care of your baby" class with all the other couples who just had babies. They were the **only** ones in the room without their baby—all of the other parents had their newborns. And of course, Ms. Panter's baby needed completely different and significantly higher level of care than the generic class offered.

5.42. Instead, Sarah Panter and Joshua Madrid were forced to sit through this class, while the rest of the parents—all with healthy newborns—watched them cry. The Government negligently inflicted this emotional distress and humiliation on this family for absolutely no reason.

5.43. Meanwhile at Vanderbilt, P.M.'s physical assessment showed a bulging fontanelle and the head was noted to have bruising, petechiae, a red circular mark around the head, an abrasion to the back of the head, and a suspected subgaleal hemorrhage. Sutures were overriding. Bruising was noted on the left arm with petechiae. Respiratory assessment noted grunting, nasal flaring, intercoastal retractions and substernal retractions.

5.44. P.M. was admitted to the NICU with respiratory distress and head swelling. At Vanderbilt, on the day of delivery, providers noted head molding, cephalohematoma, circular bruising on the superior aspect of the

scalp, overlying bogginess that tracts behind both ears, scalp lesions and lacerations. It was noted that the baby was "intubated for prolonged apnea event immediately prior to arrival of transport team."

5.45.    Providers noted delivery was complicated by "small maternal pelvis, GBS+ status, prolonged ROM and decels." P.M. was diagnosed with severe hypoxic-ischemic encephalopathy, a subgaleal hemorrhage, encephalomalacia, nonintractable epilepsy without status epilepticus, global developmental delay, gross motor development delay, fine motor delay, localization-related (focal)(partial) symptomatic epilepsy and epileptic syndromes with complex partial seizures, intractable, without status epilepticus, cortical visual impairment, abnormal posture and abnormality of gait and mobility.

5.46.    The agents and employees of the United States at Blanchfield Army Community Hospital failed to properly monitor and manage Sarah's labor and delivery, failed to recognize and act on cephalopelvic disproportion, failed to diagnose and treat uterine hyperstimulation/tachysystole, failed to timely perform a C-section in the presence of fetal intolerance to labor as evidenced in over four hours of minimal to absent variability, decelerations and no accelerations even in response to fetal scalp stimulation. After delivery, providers failed to draw blood gases that would have enabled providers to better assess and address P.M.'s injuries by providing cooling therapy. Had Government providers taken cord blood gasses and, as a result, provided cooling therapy, such therapy would have prevented or mitigated P.M.'s injuries (or at the very minimum, the failure to do so aggravated the existing injury).

5.47.    The substandard medical care provided by agents and employees of the United States at Blanchfield Army Community Hospital caused a severe, permanent brain injury to P.M. from hypoxic-ischemic encephalopathy that has resulted in feeding difficulties, seizures, global developmental delays, gross motor developmental delays, fine motor delays, cortical visual impairment, abnormal posture and abnormal mobility/gait. P.M.'s injuries are most likely permanent in nature and will require various therapies, medical care, medications, attendant care, special education and healthcare expenses throughout her life due to the negligence of the health care providers at Blanchfield Army Community Hospital.

## COMPLIANCE WITH TENN. CODE ANN. §29-26-121

6.1.    Plaintiffs have complied with the requirements of §29-26-121 Tenn. Code Ann. By providing written notice to Defendant of their medical malpractice claims more than sixty (60) days prior to the filing of this action. Specifically, Plaintiffs first provided written notice to Defendant via certified mail, return receipt requested on August 30, 2023, with the presentation and receipt of Plaintiffs' Form 95's detailing the negligent conduct, as well as providing the patient's name and date of birth, name and address of claimants, the relationship between the claimants and the patient, the names and addresses of providers receiving the notice, and the name and address of the attorney sending the notice. Defendant acknowledged receipt of the claim on October 4, 2023. Plaintiffs attach as "Exhibit A" to this complaint the Form 95's received on August 30, 2023, the letter from Defendant acknowledging receipt of the claims on October 4, 2023. Counsel for the Department of the Army further acknowledged in an email on August 5, 2024

that this information was previously received by the United States on August 30, 2023, attached to Exhibit A. The Civil Cover Sheet is attached as Exhibit B. In accordance with T.C.A. §29-26-122, Plaintiffs' Certificate of Good Faith is attached as Exhibit C.

## CAUSES OF ACTION

7.1. Through its employees, agents, or servants, the Defendant United States of America, was negligent in one or more of the following respects:

a) In failing to timely and properly monitor Sarah Panter and P.M.;
b) In failing to timely and properly care for Sarah Panter and P.M.;
c) In failing to timely and properly assess Sarah Panter and P.M.'s medical needs;
d) In failing to timely and properly diagnose Sarah Panter and P.M.;
e) In failing to timely and properly treat Sarah Panter and P.M.;
f) In failing to timely and properly assess the fetal heart rate patterns during Sarah Panter's labor;
g) In failing to timely and properly assess the fetal heart tracing as category II pattern;
h) In failing to timely and properly assess Sarah Panter every 30 minutes after the fetal heart tracing demonstrated a category II pattern;
i) In failing to timely and properly follow the category II tracing algorithm when the fetal heart tracing demonstrated a category II pattern;
j) In failing to timely and properly recognize excessive uterine activity and/or diagnose and treat uterine hyperstimulation/tachysystole;
k) In failing to timely and properly deliver P.M. by cesarean section; and

l) In failing to timely and properly draw cord blood gases and offer cooling after P.M.'s delivery.

7.2. At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by the Plaintiffs.

## DAMAGES

8.1. As a proximate result of the Defendant's negligent acts or omissions, P.M. has sustained damages and injuries including, but not limited to:

a) Past and future physical pain and suffering;
b) Past and future mental suffering and mental pain and anguish;
c) Past and future medical, health care and attendant care expenses;
d) Past and future loss of earnings and earning capacity;
e) Loss of consortium with her parents, Sarah Panter and Joshua Madrid;
f) Past and future mental impairment and disability;
g) Past and future physical impairment and disability;
h) Past and future permanent injury;
i) Past and future physical disfigurement;
j) Past and future loss of enjoyment of life;
k) Loss of years of life expectancy; and
l) Other pecuniary damages.

8.2. As the parents of P.M., Joshua Madrid and Sarah Panter, individually, have incurred damages including, but not limited to:

a) Past and future mental anguish and mental pain and suffering;
b) Past and future medical, health care, and attendant care expenses;
c) Loss of consortium with their daughter, P.M.;

d) The reasonable value of medical care, services and supplies reasonably required and given by her parents in the treatment of P.M.

e) Monetary loss, suffered or reasonably certain to be suffered in the future by the parents because of the loss of the minor's services that would have been performed prior to the P.M.'s 18th birthday;

f) Loss of the minor's earnings, reasonably certain to be suffered in the future by the parents prior to the child's 18th birthday because of the minor's inability to pursue an occupation or employment;

g) Loss of earnings;

h) Childcare expenses;

i) Out of pocket expenses; and

j) Other pecuniary damages.

8.3. In addition, Plaintiffs Joshua Madrid and Sarah Panter, individually and on behalf of P.M., seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law(s).

8.4. Plaintiffs do not seek pre-judgment interest or punitive damages. *See* 28 U.S.C. § 2674.

## RELIEF REQUESTED

9.1. Plaintiffs request that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiffs seek judgment against the United States for the amount of actual damages and for such other and different amounts that they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted,


/s/   Patrick Witherington
  Witherington Injury Law
  51 Century Blvd. Ste 125
  Nashville, TN 37214
  Tennessee Bar No. 022348
  patrick@wlawfirm.com
  (615) 697-6503
  *Local Counsel for Plaintiffs*


/s/ Laurie Higginbotham
LAURIE HIGGINBOTHAM
  lhigginbotham@nationaltriallaw.com
  Texas State Bar #50511759
  *Pro Hac Vice pending*
TOM JACOB
  tjacob@nationaltriallaw.com
  Texas State Bar #24069981
  *Pro Hac Vice pending*
STEVEN HASPEL
  shaspel@nationaltriallaw.com
  Texas State Bar #24109981
  *Pro Hac Vice pending*
WHITEHURST, HARKNESS,
  BREES, CHENG, ALSAFFAR,
  HIGGINBOTHAM, & JACOB
  P.L.L.C.
1114 Lost Creek Blvd. Suite 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)

  Attorneys for Plaintiffs